# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

ERNEST E. SCOTT,                            )
                                            )
              Plaintiff,                     )
                                            )
       v.                                   )          Case No. 09-1226
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security             )
Administration,                             )
                                            )
              Defendant.                     )

# O R D E R

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion to Affirm.  For the reasons set forth below, Plaintiff's Motion for Summary Reversal [#8] is GRANTED, and the Commissioner's Motion to Affirm [#11] is DENIED.  This matter is REMANDED for further proceedings consistent with this Order.

## BACKGROUND

Plaintiff, Earnest Scott ("Scott"), was 46 years' old at the time of his administrative hearing.  (R689) He is 6'3" and weighs approximately 369 pounds.  Id.  Scott has a high school diploma and took less than a full semester of college courses.  (R692-93)  He is divorced and lives with his girlfriend, her daughter from a previous marriage, and their daughter together.  (R689-90)  In the past, Scott has been employed as a deejay, a repossession agent, an auto parts salesman, a delivery driver, a forklift operator, a back room parts manager, and an assistant manager in another auto parts store.  (R695-97,

718)  He last worked as a managerial employee for NAPA Auto Parts in July 2004, pulling orders off trucks, stocking shelves, helping customers, controlling inventory, and money management control.  (R693)

On April 4, 2005, Scott applied for supplemental security income ("SSI") and disability insurance benefits ("DIB"), alleging disability that began on June 1, 2004.  (R88-90, 586-88)  His application was denied both initially and on reconsideration.  (R55-59, 47-50)  Scott requested a hearing before an administrative law judge ("ALJ").  A hearing was held before ALJ Alice Jordan on March 4, 2008, at which Scott, who was represented by counsel, and vocational expert ("VE") Bob Hammond appeared and gave testimony.  (R684-727)  During this hearing, Scott amended his onset date to July 1, 2005.  (R688)

Scott testified that on a typical day, he gets up between 5:00 and 7:00am, stretches, and goes to the kitchen to make coffee.  (R697-98)  He has to urinate frequently due to his diabetes.  (R698)  He can do a load of dishes, then has to sit or lay down for a bit before he can get back up.  Id.  Scott does not do the laundry, vacuuming, or other household chores and rarely cooks.  (R698-99)  He is able to drive, but does not belong to social clubs or churches or go out visiting very often because he gets too tired.  (R699)  He sometimes watches television or naps for four to five hours each day. (R699, 711)  He occasionally plays a game of solitaire or a computer game, but he can't sit, stand, or lay in one place for very long at a time.  (R700)

Scott can grocery shop once every three weeks, but only does it if he has to.  Id.  He used to mow the lawn, but now his girlfriend does most of the mowing.  (R700-01)  In the past, he enjoyed working on cars but hasn't been able to do that for years.  (R701)  He doesn't go for walks, as his doctors have advised him to walk as little as possible to avoid

further damage to his knees.  Id.  Scott is able to care for his own personal hygiene and smokes about a pack of cigarettes a day.  (R702) His girlfriend sometimes has to put his socks on for him.  (R714)

When asked to describe why he feels he can't work, Scott responded that he has a lot of pain, has a screw in his left foot, suffers from arthritis in his neck, has a torn rotator cuff in his shoulder, has golfer's elbow and carpal tunnel syndrome on his left side, and has extreme difficulty getting up and down because of his knees.  (R702-04, 706) He has back problems that prevent him from standing for too long or his legs go numb.  (R704) The medicines that he takes have also caused erosions in his stomach.  Id.  As a result of diabetes, he suffers from numbness and tingling in his fingertips and feet.  (R707)

Scott takes Celebrex and aspirin for his arthritis, as well as insulin and Actos for his diabetes. (R705-06) He has also been prescribed Xanax and Vicodin, which make him sleepy.  (R711) At the most, he can sit for an hour to an hour and a half before needing to change positions, and he is unable to stand for more than 15-20 minutes before needing to sit down.  (R708) Scott further testified that he cannot walk more than 100-150 feet at a time.  Id.  He estimates that he could lift 20lbs. routinely and up to 40 lbs. occasionally. (R709) He is able to bend over to pick something up off the floor with difficulty and is exhausted after climbing or coming down a set of stairs.  Id.  Scott stated that he needs to lay down for a period of time to relieve cramping and pain virtually every day.  (R716-17)

The ALJ presented the VE with the following hypothetical:

> Q:  I'm going to ask you if you were to assume a person 46 years old with a high school education with past relevant work same as the claimant's.  I ask you to assume that this person would be able to do, let's start with light and sedentary.  I think I know where we're going with this but I'll still see what we've

got at light and sedentary in case there's transfers.  With the following limitations . . . They've got occasional and I think that's probably correct on all of the postural limitations and of course, never ladders, ropes, and scaffolding.  Only occasional reaching overhead, jobs that would cause reaching over the head with the left arm which is the non-dominant arm.  Because of the diabetes, I'm going to put no concentrated exposure to cold, no hazards, machinery or anything because of the diabetes, probably the numbness would be dangerous to that.  With those restrictions, could he return to any of his prior work?

A: Your Honor, based upon those restrictions, the disc jockey position would still be a qualified position and the, as listed and usually performed in the national economy, the auto parts manager position would still be a qualified position.

Q: The parts manager?

A: Yes..

Q: That wouldn't require any lifting or anything that would be over the limit?

A: That's classified at light duty as it's normally performed in the national economy and I would be hard pressed personally, Your Honor, to find a manager in an auto parts store with the exception of a very, very, very, very largest store that does not do some sort of loading or unloading or stocking of the shelves.  I do think that there's a possibility that the position that the person could do, or the hypothetical could perform regional management positions as far as auto parts stores are concerned.  But I really don't think they can, my personal opinion is he can't do the manager, the store manager.

Q: Okay.

A: The hypothetical can't.  Disc jockey position, I think still would be a qualified position.

Q: Are there transferable skills?

A: Yes, Your Honor.  There's a number of transferable skills.  The, the retail management position is an SVP of seven.  It would be a lot of management responsibilities.  There would

- 4 -

be a lot of clerical activities, paper work, supervision, scheduling. There would be a number of transferrable skills both to the light and to the sedentary categories based upon that position alone. In conjunction, customer service position would dovetail then with the disc jockey, the ability to perform a variety of activities. The ability to do not just paper work but to maintain their own business records and to keep track of all those kinds of things for running your own business.

Q: And could you translate those into jobs that would transpose skills that it would apply to?

A: There's a general classification, Your Honor, for what's called general manager, 191.117-038. This is a regional manager for retail and other, combination of different types of employers such as parts, clothing, lumber, things like that for general manager position. It's an SVP of seven and it's classified as a light duty position. There are sales manager, Your Honor, district sales manager positions, 186.167-034. It's an SVP of seven. It's a sedentary position.

Q: That was sales manager?

A: Yes, general sales, general regional sales manager.

Q: You didn't give me numbers on either of those.

A: Oh, I apologize, Your Honor. General regional sales manager, Your Honor, the numbers are 11,900. The business manager which is a combination of positions, again regional management position, the numbers on that are 13,101. And when we move into the SVP level of three, Your Honor, there's also a number of clerical positions such as a general clerk at 209.462-010. It's an SVP of three. It's a light duty position, there are 20,000 of those. And last, but not least, I would classify again with a lower level SVP, electronics technician, 726.684-026. It's an SVP of three. It's a light duty position. There are 10,800 of those. Do you want me to move into sedentary at this point, Your Honor?

Q: Give me a sedentary job or two, an example of a sedentary job or two because I'm sure counsel is going to ask about a sit/stand option –

A: Okay.

Q:  – and it may be warranted.

A:  Dispatcher, 249.167-014.  It's an SVP of five.  It's a sedentary position.  There are 16,150 of those.  Cashier I, 211.362-010.  It's an SVP of five.  It's a sedentary position. There are 11,000 of those.  And again, there's a number in the lower SVP levels.

Q: Okay.  All right.  And those are jobs that you feel like have some direct transfer?

A: Yes.

Q: Okay.  And they are consistent with the DOT?

A: They are.

Q: And they're representative?

A: Yes, they are.

(R719-23)

Scott's attorney then amended the hypothetical question to include a limitation to only two hours total of sitting, standing, or walking, to which the VE responded that with that limitation, the individual would not be qualified for full-time employment.  (R723) If the hypothetical individual had a restriction of absenteeism three or more times a month due to pain, the VE opined that this could not be accommodated in the lower level SVP of five or below, but might be allowable in the higher level SVP.  Id.  However, if the amount of absences exceeded three per month, even these positions would be eliminated.  Id.

Q: [If we accepted the claimant's testimony as credible as supported by the evidence and let's assume that due to pain and side effects of medication, an individual would be off task work 20 to 25 percent of the work day and what I mean by off task, they would be productive or unable to because of problems with concentration attending to the workstation. Could that person sustain any of the jobs you listed in the hypothetical from the Judge?

A: It's my opinion that the, that that would put them at the 75 percent productivity level, persistence and pace, and that that would be excessive and all positions would be eliminated.

Q: Okay.  And do any of the positions that you stated in your hypothetical, in the hypothetical, do they allow for any, let's say, reclining or laying down outside of the normal rest periods or breaks during the day?

A: No.

(R723-24)

The ALJ then asked a few clarifying questions:

ALJ: You indicated in one of these exhibits, there's only a sit or stand, two hours out of an eight-hour day?

Atty: Well, Dr. Brewer and Dr. Fernandez, 11F, Dr. Fernandez, and Dr. Brewer, 26F.  It's my understanding they limited his, there are certain, they have options of zero to eight hours of sitting, zero to standing.

ALJ: I saw that and I wondered if –

Atty: That's one hour sitting –

ALJ:  – they didn't know how to read it.

Atty: – and one hour standing.

ALJ: I mean if that was a mistake because my understanding was that usually means is up to that, you know, more than, but, yeah, I understand. . . .I understand a manager couldn't be a full job time if he worked four hours.

Atty: So I, I was aware that it would preclude full time work but, you know, if this were to go to the Appeals Council, I have to make a record of it being asked as a —

ALJ: Okay.  Certainly.  Like said.

Atty: And I would also note that September 19th of 2005 and I don't have the exhibit number with me, but it's from Dr. Sips or Sips.  Sips, excuse me.  He does [sic] that we will probably

- 7 -

give him a permanent disability due to his significant knee arthritis while it did say he would improve after a knee replacement and he hasn't had the knee replacement yet so.

* * *

ALJ: Let me ask one more hypo of the VE then.

Q: The jobs that you did list, Mr. Hammond, if a person could only stand no more than two out of eight hours, but can sit the rest of the time, would any of these jobs still be available?

A: It would eliminate all the light duty level positions, Your Honor, and take it to the sedentary level.

Q: Okay.

A: So the sedentary positions would be the only qualified positions.

Q: And if a person needed a sit/stand option, we'd be back to the sedentary jobs or what?

A: Well, we're back to the sedentary jobs but we have a little problem with the sit/stand option at liberty.

Q: Okay.

A: Let's take, for example, the regional sales positions that I identified that have the higher level SVP.  Some of those positions on occasion will require extensive driving times in excess of two hours.  So if it's a sit/stand option, it's my opinion that that would take an accommodation because of the length of time on the road.

Q: Okay.  Thank you very much.

(R724-27)

On March 14, 2008, the ALJ issued her decision.  (R26)  The ALJ found that Scott

has a severe combination of impairments based on the requirements in the Regulations,

including obesity, hypertension, gastroespohageal reflux disease, diabetes with peripheral

- 8 -

neuropathy, carpal tunnel syndrome, cervical degenerative disc disease with C8 left radiculopathy, and osteoarthritis of the shoulders and knees. (R15) The ALJ determined, however, that Scott does not have an impairment or combination of impairments listed in or medically equal to one listed in 20 CFR Part 404, Subpart P, Appendix 1. (R31) She recognized impairments posed by Scott's musculoskeletal condition but found that this did not satisfy the listing because he retains the ability to ambulate and perform fine and gross movements effectively and further concluded that his hypertension does not meet the listing because he does not have chronic heart failure or ischemic heart disease. (R32) The ALJ also noted that Scott's diabetes mellitus does not satisfy a listing because he does not have the required neuropathy, episodes of acidosis or vision impairment. Id.

After considering the medical evidence in the record and relevant credibility factors as a whole, the ALJ found that Scott retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he needs to sit or stand as needed during the workday, cannot more than occasionally climb, balance, stoop, kneel, crouch or crawl, cannot do overhead lifting with his left arm, cannot work in concentrated exposure to cold, and cannot work around hazards. Id. The ALJ concluded that Scott's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (R33) However, his assertions regarding the intensity, persistence, and limiting effects of the symptoms were found to be not credible to the extent that they are inconsistent with the RFC assessment. Id.

The ALJ considered Scott's obesity and the combined effect that obesity can have on other impairments. Id. His hypertension and reflux disease are not disabling alone or in combination with his other impairments, as occasional emergency room visits for

abdominal complaints have not resulted in any prolonged hospitalizations or significant objective findings, and his doctor deemed his hypertension to be stable with a good prognosis.  Id.   Scott's diabetes has also been described in his medical records as stable with a good prognosis.  Id.  Joint problems (carpal tunnel syndrome, cervical degenerative disc disease, osteoarthritis of the shoulders and knees, and torn rotator cuff)  were found to limit his capacity, but not to the extent that all work was prevented.  Id.  Medical records show reduced motion in his left knee, but no instability or sensory loss; he was treated conservatively with Ibuprofen and encouraged to exercise and lose weight.  (R34) His shoulder pain, carpal tunnel syndrome and peripheral neuropathy were determined to be mild with his grip intact.  Id.  His doctors noted full motor strength, full motion in his hands, wrists, and elbows, and 125 degrees of active motion in his knees.  Id.  In December 2007, his physician noted loss of vibratory sensation in the ulnar nerve distribution of his right hand and index finger, with reduced cervical range of motion and radicular symptoms from the neck down to the shoulders and down his back.  Id.

The ALJ further considered the fact that Scott was not taking the kind of strong analgesics usually prescribed for severe and unremitting pain.  Id.  While he has had multiple emergency room visits for abdominal issues as discussed above, he has not been to the emergency room based on his joint problems since the alleged onset of his problems, and has not undergone regular continuing treatment beyond his office visits, such as physical therapy, visiting a pain clinic, or using a TENS unit.  Id.  The ALJ noted that usual objective signs of severe pain, such as abnormal weight loss or muscle atrophy, are not present.  Id.  The record further demonstrates Scott's refusal to comply with a regimen that would be healthier for him, as well as his admission that he can care for his

personal needs, shop for 30-45 minutes before resting, vacuum for about 10 minutes, ride a mower for 30 minutes, do some cooking or dishes, watch children, spend time on his computer, and help his parents.  Id.

Past relevant work was found to be precluded, but Scott acquired work skills from his past work as a parts manager that could be transferred to sedentary jobs.  (R36) Based on a consideration of his age, education, work experience, and residual functional capacity, the ALJ concluded that he retained the capacity to perform a range of sedentary work and that he was not under a disability as defined under the Social Security Act at any time since his alleged onset on July 1, 2005.  (R36-37)

Scott submitted a Request for Review of Hearing Decision.  (R24-25)  On March 4, 2009, the Appeals Council declined review of his claim.  (R12-14) On June 4, 2009, Scott was advised that the Appeals Council had received additional information and was setting aside its earlier decision; however, after considering the additional evidence, the request for review was again denied, and the ALJ's decision became the final decision of the Commissioner.  (R7-9)  This appeal followed.  The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

In order to be entitled to SSI or DIB, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled.  Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits.  See 20 C.F.R. §§ 404.1566, 416.966 (1986).

- 11 -

The establishment of disability under the Act is a two-step process.  First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382(c)(a)(3)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980).  That factual determination is made by using a five-step test.  *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows:  (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled.  A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled.  Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment.  Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

In his appeal, Scott raises essentially two claims: (1) the ALJ erred by failing to follow the treating physician rule, and (2) the ALJ erred by failing to properly evaluate his credibility. The Court agrees and finds that the ALJ's finding that Scott has the residual functional capacity to perform the physical exertion and nonexertional requirements of a range of sedentary work with certain limitations is not supported by substantial evidence.

Scott argues that the ALJ erroneously discounted the opinions of his treating physicians. The Seventh Circuit has recognized that a treating physician's opinion is not binding on the Commissioner. Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982). However, there is no presumption of bias against a treating physician's disability opinion. Edwards v. Sullivan, 985 F.2d 334, 337 (7th Cir. 1993). Rather, the ALJ, as the trier of fact, must consider the treating physician's possible bias. Id. The Commissioner will not give controlling weight to the treating physician's opinion on the nature and severity of the

- 13 -

claimant's impairments unless the treating physician's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and consistent with substantial evidence in the record.  20 C.F.R. § 416.927(d)(2); Moss v. Astrue, 555 F.3d 556, 560 (7th Cir. 2009).

> In short . . . it is up to the ALJ to decide which doctor to believe -- the treating physician who has experience and knowledge of the case, but may be biased, or that of the consulting physician, who may bring expertise and knowledge of similar cases -- subject only to the requirement that the ALJ's decision be supported by substantial evidence.

Micus v. Bowen, 979 F.2d 602, 609 (7th Cir. 1992).

It is the province of the ALJ to resolve evidentiary conflicts.  Ehrhart v. Secretary of Health and Human Services, 969 F.2d 534, 542 (7th Cir. 1992); Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).   The existence of an evidentiary dispute is not grounds for reversing the ALJ's decision to credit one version of facts over another.  Herr v. Sullivan, 912 F.2d 178, 181 n.4 (7th Cir. 1990)  However, the ALJ must explain with particularity the basis of his decision.  Young v. Secretary of Health and Human Services, 957 F.2d 386, 393 (7th Cir. 1992).

In the fall of 2005, Dr. Angelito Fernandez completed a Multiple Impairment Questionnaire in which he diagnosed degenerative disc disease, degenerative joint disease of the left knee, and diabetes mellitus.  (R272) Dr. Fernandez opined that Scott could sit less than one hour and stand/walk less than one hour in an eight-hour workday.

(R274) Scott could not sit continuously in a work setting but rather must get up and move around every 15-20 minutes without sitting again for 20-30 minutes.  (R274-75) He can lift or carry up tp 10 pounds occasionally and has significant limitations in repetitive reaching, handling, fingering, and lifting.  (R275-76)  Dr. Fernandez prescribed Vicodin and Ibuprofen, as well as epidural cortisone injections.  (R276) He noted that Scott's pain, fatigue, and other symptoms were severe enough to interfere with his attention and concentration and that he was limited to low-stress jobs.  (R277)  He estimated that Scott would require 5-10 unscheduled breaks during an eight-hour workday and would have to rest for 30 minutes each time.  Id.  Dr. Fernandez further stated that Scott could need to be absent from work more than three times per month because of his conditions. (R278)

Several times in 2005, Scott presented to the emergency room complaining of abdominal pain.  (R407-434) He was diagnosed with acute pancreatitis, diabetes, hypertension, GERD, hyperlipidemia, and obesity and was prescribed Darvocet.  (R407)

In November 2005, Scott complained of increased blood sugar and musculoskeletal pain and was diagnosed with diabetes, hyperlipidemia, chronic low back pain, and osteoarthritis of the knees.  (R562) His dose of Insulin was increased and he was also prescribed Ultram for pain management.  Id.  In May 2006, he was diagnosed with upper left back strain and received a prescription for Toradol and Valium.  (R400)  At some point, contrary to the ALJ's findings, Scott was also prescribed the use of a TENS unit to help control his chronic pain; however, in May 2006, he reported that the TENS unit did not help to alleviate his pain.  (R296)  In June 2006, Scott participated in physical therapy and was prescribed cervical traction to alleviate nerve compression.  (R296).  He continued to have issues with his blood sugar and complained of pain throughout 2006.  (R559-61)

In 2005, Dr. Brian Sips also saw Scott for his chronic left knee pain.  Dr. Sips noted a range of motion from 5-120 degrees in his left knee, +1 edema of the lower extremity, and moderate medial joint line tenderness.  (R385) Following an MRI, he was advised to lose weight, as well as to wear a brace and participate in physical therapy, to alleviate his symptoms.  (R384) An exam in September 2005 revealed a range of motion from 0-100 degrees in his left knee.  (R383) Scott stated that his pain was generally associated with stairs or squatting and rated his pain as a 7-8 on a 10 point scale when he ambulates and 1 out of 10 when at rest.  Id.  He requested a disability form, stating that he had difficulty getting to the store and ambulating, but said he didn't feel like his pain was bothering him enough at that time to have Cortisone injections.  Id.  Although Dr. Sips indicated that he would probably give him a permanent disability rating at that time, he also noted that he was likely to improve after getting a knee replacement.  Id.

In February 2006, Scott saw Dr. Thomas Huber, his treating gastroenterologist, for treatment of his colitis.  (R395)  Dr. Huber prescribed Sulfasalazine and directed Scott to let them know if it helped.  Id.

Scott returned to Dr. Sips again in April 2006, when he returned complaining of continued pain in his left knee and also popping and pain in his right knee.  (R382) X-rays of his right knee showed medial sclerosis, joint space narrowing, and degenerative changes.  Id.  Dr. Sips again discussed treatment options including weight loss, physical activity, anti-inflammatories, and Cortisone injections; Scott again declined the Cortisone injections.  Id.  In May 2006, Scott complained of pain in his neck and left shoulder and was given a shot of Toradol.  (R381) A week later, he again complained of left shoulder pain and was referred for an EMG and physical therapy.  (R380) The EMG showed mild

to moderate left C8 radiculopathy, moderate left ulnar nerve neuropathy secondary to compression of the nerve at the cubital tunnel, mild left carpal tunnel syndrome, and superimposed mild peripheral neuropathy related to diabetes. (R379) In August 2006, Dr. Sips diagnosed right upper extremity radiculopathy, left greater than right knee pain, and bilateral knee degenerative joint disease and gave Scott an injection of Depo-Medrol. (R375)

In March 2007, Scott began seeing Drs. Kate Austman and Ben Brewer as his family physicians. (R520) He complained of intermittent stomach pain and knee pain that prevents him from exercising. Id. Dr. Austman diagnosed hypertension, hyperlipidemia, morbid obesity, osteoarthritis, and tobacco use and prescribed Ultram, Pepcid, Novolin R, Lisinopril, Lipitor, ASA, and Actos. (R521) She noted that Scott refused to comply with a regimen that would be healthier for him and that she was unable to prescribe narcotics for him on the first visit. Id. Scott indicated that he would just get them from his dad. Id. Later that month, he was prescribed Chantix to help him quit smoking and Vicodin for his knee pain. (R517)

In April 2007, Scott saw Dr. Kenneth Renner at Dr. Brewer's request to evaluate his knee pain. (R475) Dr. Renner described Scott's history as "somewhat difficult" and expressed concerns regarding the accuracy of the history due to some possible inconsistencies. Id. On examination, Dr. Renner observed both knees having at least 0-125 degrees active range of motion, mild patellofemoral compression tenderness bilaterally, no ligament laxity, 0-1+ spacer loss bilaterally, and negative effusion. Id. The exam was somewhat limited due to Scott's obesity. Id. Dr. Renner noted that his left knee did have more significant medial joint line tenderness and positive McMurray's. Id. An MRI

was recommended if it could be obtained given Scott's weight, and exercise, need for weight loss, low impact exercise, and the possibility of injections to help with knee discomfort were discussed.  Id.

In June 2007, he saw Dr. Brewer for pain and difficulty standing and obesity. (R512) Dr. Brewer prescribed Celebrex, Vicodin, Xanax, and Lortab.  Id.  In November 2007, Scott stated that he had a moderate impairment in his ability to function on most days, that he was unable to stand or sit for more than about two hours, and that he had problems with fine manipulation of his hands due to nerve entrapment problems in his wrist, left elbow, and neck. (R499) Dr. Brewer found that his weight had increased but that he was in no acute distress with equal grip strength bilaterally and no evidence of muscle atrophy in his hands.  Id.  The treatment notes indicate Dr. Brewer's belief that Scott is disabled due to his multiple medical conditions and the recommendation that he stop smoking and lose weight.  Id.

In December 2007, Scott advised that he was doing OK with pain control, but had some good days and some bad days. (R495) His activities were greatly limited by his arthritis, neuropathy problems, and diabetes.  Id.  On examination, Dr. Brewer observed that Scott was obese and was limited in walking by his knee and back pain. (R496) Shortly thereafter, Dr. Brewer completed a Multiple Impairment Questionnaire in which he diagnosed diabetes, osteoarthritis, morbid obesity, gastroesophageal reflux, hypertension, cervical degenerative disc disease, and carpal tunnel syndrome. (R443)  Although the diabetes and hypertension were reported to be stable with treatment, Dr. Brewer opined that Scott's cervical disc disease and osteoarthritis of his knees and shoulders was causing long-term disability and not likely to improve.  Id.

In this Questionnaire, Dr. Brewer reported clinical findings of loss of vibratory sensation in the ulnar nerve distribution of the right hand and index finger, reduced range of motion in neck extension and lateral side bending, radicular symptoms from the neck down the shoulders and radiating to the mid-back, and bilateral medial knee pain and crepitance.  (R443-44)  Lab reports documenting diabetes and cholesterol problems were also submitted.  (R444) Scott's symptoms were noted as pain in multiple joints, cervical spine, loss of sensation due to diabetes in fingers, hands, and feet, as well as frequent fatigue.  Id.  Dr. Brewer opined that these symptoms were reasonably consistent with Scott's described impairments.  Id.

Dr. Brewer further noted that Scott suffers from constant neck pain, becoming more severe with activity, that alternates between sharp pain and a constant dull ache.  Id.  He experiences pain in his neck, both shoulders, wrists, knees, and in his hands and feet.  Id.  The pain in his neck and knees is described as constant, while the pain in his lower back is intermittent.  (R445) On average, Dr. Brewer rated Scott's pain as a 4/10, ranging to 10/10 and his fatigue as a 6/10; Dr. Brewer further noted that he had not been able to completely relieve the pain with medication without unacceptable side effects.  Id.

In an eight-hour day, Dr. Brewer opined that Scott could sit for no more than one-hour, stand or walk for one hour, and could not sit/stand/walk continuously but rather must get up and move around hourly.  Id.  After 20-30 minutes of moving around, Scott could resume sitting. (R446) Scott could occasionally lift up to 20 pounds and carry up to 10 pounds.  Id.  He has significant limitations in doing repetitive reaching, handling, fingering or lifting due to loss of sensation and pain in his hands and suffers from moderate limitation in grasping, fine manipulation; his impairment in reaching is marked.  (R446-47) Dr. Brewer

concluded that Scott's symptoms would likely increase if he were placed in a competitive work environment and that he could not do a full-time competitive job that required him to keep his neck in a constant position, such as looking at a computer.  (R447-48) His pain and fatigue would frequently interfere with Scott's ability to concentrate.  (R448).  He would also need 30 minute breaks hourly to rest and would likely have good days and bad days requiring absences more than three times per month.  (R448-49) Finally, Dr. Brewer stated that in his opinion, the earliest date that Scott experienced these symptoms and limitations was March 8, 2007.

On February 11, 2008, Scott visited Dr. Brewer for adjustment of his insulin levels. (R613)   Dr. Brewer completed a second Multiple Impairment Questionnaire on February 22, 2008, in which his findings remained essentially unchanged from the first questionnaire. (R486-93)

The ALJ acknowledged that Scott suffered from a severe combination of impairments, including obesity, hypertension, gastroespohageal reflux disease, diabetes with peripheral neuropathy, carpal tunnel syndrome, cervical degenerative disc disease with C8 left radiculopathy, and osteoarthritis of the shoulders and knees.  (R31) The ALJ further noted that these impairments cause more than minimal limitations in the claimant's ability to work.  Id.  Despite these impairments, the ALJ concluded that Scott has the residual functional capacity to perform sedentary work, except that he needs to sit or stand as needed during the workday, cannot more than occasionally climb, balance, stoop, kneel, crouch or crawl, cannot do overhead lifting with his left arm, cannot work in concentrated exposure to cold, and cannot work around hazards.  (R32)

In making these findings, the ALJ noted that while Scott's medically determinable impairments could reasonably be expected to produce the alleged symptoms, Scott's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the residual capacity assessment.  (R33) The ALJ considered his obesity and the effect that his obesity could have on his other impairments.  Id.  The ALJ then reviewed the hospital visits and Dr. Huber's notes regarding his hypertension and reflux disease, including statements by Dr. Brewer that Scott's hypertension was stable with good prognosis and that his epigastric pain was controlled with medication.  Id.  Dr. Brewer's finding that his diabetes was stable with a good prognosis was also noted.  Id.

The ALJ acknowledged Scott's various joint problems, including carpal tunnel syndrome, cervical degenerative disc disease with C8 left radiculopathy, and osteoarthritis of the shoulders and knees with a history of torn rotator cuff on the left, as well as the fact that they his work capacity somewhat.  Id.  Dr. Sips's records were found to be inconsistent with a finding of complete disability, as the records reflected reduced motion and edema, but negative straight leg raising, no instability, no joint line tenderness, and no sensory loss.  (R34) Notes from the treatment of his shoulder demonstrate mild hypertrophy of the AC joint, mild to moderate left C8 radiculopathy, mild left carpal tunnel syndrome, and Scott's admission in June 2006 that his pain was mild.  Id.  Brief reference was also made to Dr. Renner's findings of 125 degrees of active motion in Scott's knees, mild patellofemoral compression tenderness, and full motor strength, as well as Dr. Brewer's finding of loss of vibratory sensation in the ulnar nerve distribution of the right hand and

index finger, with reduced cervical range of motion and radicular symptoms from the neck down to the shoulders and down the back.  Id.

With respect to Scott's residual functional capacity, the ALJ determined that the opinions of the state agency physicians were not entitled to significant weight, as they did not have the benefit of reviewing the most recent medical evidence or assessing Scott's credibility.  (R34-35) Dr. Fernandez' RFC assessment that Scott could sit, stand, or walk no more than one hour per day, needed to move around every 15-20 minutes, and could lift up to 10 pounds was accepted as to the lifting limits; however, the suggestion that he could not sit up and work for eight hours with the ability to alternate positions as needed was discounted as unsupported by the objective and other evidence of record.  (R35) Dr. Fernandez' opinion that Scott would need to be absent from work at least three days per month was also discounted as unsupported by significant objective findings.  Id.

Dr. Brewer's RFC assessments found that Scott could not sit, walk, or stand more than one hour per day but could lift up to 20 pounds and would likely miss more than three days per month were also considered and assigned the same weight as Dr. Fernandez' opinions for the same reasons.  Id.  The ALJ further found Dr. Brewer's assessment to be not only unsupported by objective findings in the record, but also unsupported by his own progress notes, which the ALJ represented as showing detailed discussions about blood sugar levels and treatment recommendations such as proper diet, exercise, and smoking cessation but lack any findings of severe loss of motion or other joint abnormalities.  Id.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight so long as it is supported by medical findings and consistent with substantial evidence in the record.  Elder v. Astrue, 529 F.3d 408, 415 (7th

Cir. 2008), *citing* Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004).  The weight to be afforded to the treating physician's opinion depends on consideration of several factors: (1) the length, nature, and extent of the physician and claimant's treatment relationship; (2) whether the physician supported his or her opinions with sufficient explanations and medical findings; (3) and whether the physician specializes in the medical conditions at issue; and (4) the degree of consistency between the opinion and other evidence in the record.  Id.; 20 CFR § 404.1527(d).    "If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ 'minimally articulate[d]' his reasons – a very deferential standard that we have, in fact, deemed lax."  Id., *quoting* Berger v. Astrue, 5165 F.3d 539, 545 (7th Cir. 2008).

Here, the ALJ concluded that the opinions of Scott's treating physicians with regard to his ability to sit, stand, or walk during an eight-hour work day were to be discounted because they were not supported by objective evidence in the record.  There is no citation to other medical evidence of record expressing a contrary opinion in this respect or objectively establishing a greater functional capacity.  In fact, the ALJ expressly stated that she was not relying on the opinions of state agency reviewing physicians that, if considered, would have supported a greater RFC than that reported by Scott's treating physicians.  Furthermore, several factual observations made by the ALJ are inconsistent with the evidence of record.  Dr. Fernandez' opinions were accompanied by x-rays showing cervical degenerative joint disease and an MRI of the left knee showing high grade chondromalacia involving the lateral patellar facet and anterior weight-bearing surface of the lateral femoral condyle; no effort is made to indicate why these diagnostic findings are not supportive of his opinions.  Dr. Brewer's notes note bilateral crepitance in the knees

with inflammation and effusion, reduced range of motion in the neck, radicular symptoms from the neck down the shoulder and radiating to the mid-back.  Dr. Sips's notes were also discounted based on notations that straight leg raising tests were negative and lack of joint line tenderness or sensory loss.  However, Dr. Sips's treatment notes reference an MRI showing complete denuding of his cartilage on the patella and weightbearing surface of the lateral femoral condyle, bilateral crepitus at the knees, x-rays showing medial sclerosis, joint space narrowing and degenerative changes in his right knee, medial joint line sclerosis with osteophyte changes on the tibial plateau, lateral facet completely impinging on the lateral femoral condyle with loss of articular cartilage, moderate medial joint line tenderness, x-rays showing significant tricompartmental degenerative joint disease of the left knee including cystic formations, osteophyte formations, sclerosis, and medial joint space narrowing.  (R382-85)

It is simply not clear from the ALJ's discussion why these objective findings are inconsistent with the opinions given by the treating physicians, and it is not the province of this Court or the Commissioner to provide such a rationale for the ALJ.  While the Commissioner makes several persuasive assertions in his response in an attempt to bolster the boilerplate, summary discussion of the ALJ (e.g., that the physicians were family doctors not orthopedic specialists, that the limitations they set forth were out of proportion to the findings of the examining specialists Drs. Sips and Renner, that the opinions appeared to be based primarily on Scott's subjective complaints), such assertions are simply not reflected in the opinion of the ALJ.  Rather, from a plain reading of the ALJ's decision, it would appear that the ALJ based her findings of residual functional capacity on

her own lay interpretation of the medical data reflected in a select assortment of treatment notes from Scott's treating physicians.

The Seventh Circuit has held that regardless of whether there may be adequate evidence in the record to support an ALJ's decision, "the ALJ must rationally articulate the grounds for her decision, building an accurate and logical bridge between the evidence and her conclusion because we confine our review to the reasons supplied by the ALJ." Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003), *citing* Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002).   The Court must agree with Scott that the ALJ in this case failed to sufficiently build an accurate and logical bridge, appearing to largely rely on her own assessment of the medical evidence or alternatively what she believed was lacking in the evidence.   The transcript of the hearing even reflects some confusion on the part of the ALJ as to precisely what Drs. Fernandez and Brewer meant with respect to the opinions regarding Scott's ability to sit/stand/walk in their RFC assessment, but there is no indication that this was ever clarified.   An ALJ may not substitute her own judgment for a physician's without relying on other medical evidence in the record.   Murphy v. Astrue, 496 F.3d 630, 634 (7th Cir. 2007).

As the extent to which the ALJ in this case properly interpreted the evidence from Scott's treating physicians and/or relied on other medical evidence in the record in discounting their opinions is not adequately reflected in her opinion, this matter must be remanded to the Commissioner for further explanation and clarification of the ALJ's weight attributed to and discounting of the treating physicians' opinions and corresponding residual functional capacity determination.   The Court therefore concludes that the Agency's decision must be reversed pursuant to sentence four of 42 U.S.C. § 405(g),

which authorizes the Court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  This matter will be remanded to the Commissioner for rehearing to correct the above identified deficiencies.

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [#8] is GRANTED, and the Commissioner's Motion to Affirm [#11] is DENIED.  The Commissioner's decision in this matter is REVERSED, and the case is REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration. The Clerk's Office is hereby directed to enter Judgment in favor of Plaintiff and against Defendant.

ENTERED this 7th day of April, 2010.


s/ Michael M. Mihm
Michael M. Mihm
United States District Judge